## Case No. 385.

### The ANGELINE.

[5 Adm. Rec. 202.]

District Court, S. D. Florida. March 25, 1854.

SALVAGE—LICENSED WRECKERS — PILOTAGE—REFUSAL OF ASSISTANCE.

[1. It is the duty of licensed wreckers to offer their services as pilots to vessels in need of pilotage, whether such vessels ask for a pilot or not; and, in the absence of a special agreement, recovery may be had of a reasonable compensation for such services.]

[Cited in Curry v. The Loch Goil, Case No. 3,495.]

[2. Licensed wreckers who refuse to furnish pilotage services when asked to do so should not be allowed a greater award for salvage services thereafter rendered than they would have been entitled to for the pilotage, when the necessity for the salvage services resulted from a lack of pilotage.]

[Cited in Curry v. The Loch Goil, Case No. 3,495.]

[In admiralty. Libel for salvage by William Watson, Noyes, and others against the schooner Angeline and cargo. Decree for libellants.]

W. W. McCall, for libellants.
S. I. Douglas, for respondent.

MARVIN, District Judge. This schooner, measuring about 110 tons, bound from Willmington to New Orleans laden with fifty barrels of tar, 100 pitch, and 400 rosin, ran ashore on the Carrysfort reef, about seven miles south of the light house, in the afternoon of the 19th instant. She had got ashore about thirty miles to the northward, early in the morning of the same day, when the libellants, Noyes of the sloop Vineyard, and Watson of the Mary H. Williams, went out to her. At the time they arrived she had been got off. The captain wanted a pilot, and asked Captain Noyes of the sloop Vineyard if he could give him a pilot. He answered "no;" they "were not pilots, but wreckers." Not getting a pilot, and not seeing his way out into the gulf, the captain undertook to come to Key West, inside the reef. He got under way and ran about thirty miles, when the vessel got ashore on one of the reefs. The captain now employed the libellants to assist him, and get him off.

The services rendered by the libellants, considered simply in themselves and unaffected by antecedent circumstances, were not of a very highly meritorious character. They consisted simply in taking out of the vessel 130 barrels of tar and rosin, which the master could have easily thrown overboard, and in good weather, heaving the vessel off. She was small, and could be easily managed by the crew of one wrecking vessel. The whole property is worth about $2,100. Under these circumstances about $400 would be a reasonable compensation for this service, but for the antecedent circumstances.

Now had the captain, Noyes, when he

boarded the schooner in the morning, surrounded as she was by shoals and rocks, piloted her into the gulf, or to this port, I should not think $400 would be an unreasonable compensation, and he would in this manner have made as much by piloting this vessel, as he had any reasonable grounds for expecting he could make by getting her off the reef, in case she should get ashore. But it was the duty of the captain, Noyes, under the penalty of a diminution of compensation, to furnish a pilot, and not have replied they "were not pilots but wreckers." The licensed wreckers are pilots; and they are licensed as such to perform pilot service, as to carry out anchors and lighten vessels, and it is expected that every licensed master wrecker knows enough of the coast, and of the reef, to pilot, under ordinary circumstances, any vessel that may require their services. The amount of compensation for piloting, if not agreed upon and settled, is to be ascertained and determined in the same manner, that compensation for salvage service is determined, and the same legal remedies may be resorted to, for the recovery of the one as the other. The wreckers are not bound to pilot vessels, to point out shoals, or channels, or to give information concerning the tides gratuitously and without compensation, any more than they are bound to carry out anchors and lighten vessels without compensation, and the rendering any one of these services, at the request of the master under circumstances implying that it was not intended to be gratuitous, will entitle the wrecker, equally with any other service, to a reasonable compensation. And he is not at liberty to decline performing any minor service for a reasonable compensation in the expectation that any emergency may arise in which he may be called upon to perform greater. In the case of The Howard, [Case No. 6,752a,] decided in 1838, (see files,) Judge Webb said: "He who holds back and quietly looks on at approaching ruin, until his own services become indispensable to the preservation of the property he sees exposed, with the expectation, that his reward will thereby be increased in proportion to the increased dangers, from which the property is ultimately rescued, will find that he is disappointed in the realization of his golden hopes, and that a display of his avarice at such a time, renders him an object of contumely and reproach." And in the case of The Montgomery, [Case No. 9,733,] the court said: "A prominent feature in the merit of the salvors, is the promptness with which their services were rendered. This is a quality highly commended in this court upon grounds of policy. A single anchor opportunely carried out, the assistance of a single wrecking vessel for half an hour, will often save a large amount of property from total loss. 'Bis dat qui cito dat.' On the other hand, tardiness in rendering such apparently slight, but really valuable, services, is severely reprehended."

In the present case, I think it was as much the duty of Captains Noyes and Watson both to offer their services as pilots to the master of the schooner, when they saw, that he needed such services, as it would be their duty to offer their services to lighten his vessel, and carry out his anchors, and get him off the reef, when they saw his vessel to be ashore. It was his duty, if he wanted a pilot, to ask for one, and to manifest a willingness to pay a reasonable compensation for his services; or to refer the amount to the proper legal tribunal; and it was their duty, when they saw the situation of his vessel to be such as to need a pilot, to offer their services as such pilots,—whether he asked for a pilot or not. Under the circumstances, I think one hundred dollars is a reasonable remuneration for the services rendered.